1  **HANNI M. FAKHOURY**
California Bar No. 252629
2  **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
3  San Diego, California  92101-5008
Telephone:  (619) 234-8467
4  Hanni_Fakhoury@fd.org

5  Attorneys for Mr. Quinonez

6

7

8                          UNITED STATES DISTRICT COURT

9                        SOUTHERN DISTRICT OF CALIFORNIA

10                       **(HONORABLE THOMAS J. WHELAN)**

11  UNITED STATES OF AMERICA,           )    CASE NO.: 08CR0301-W
                                        )
12                  Plaintiff,          )    DATE: March 24, 2008
                                        )    TIME: 2:00 p.m.
13  v.                                  )
                                        )
14  **CARLOS DAVID QUINONEZ, SR.,**     )    STATEMENT OF FACTS AND
                                        )    MEMORANDUM OF POINTS AND
15                  Defendant.          )    AUTHORITIES IN SUPPORT OF MOTIONS
                                        )
16  _____    )

17                                      **I.**

18                              **STATEMENT OF FACTS**[1]

19          On January 24, 2008, at approximately 12:47 a.m., Mr. Quinonez drove to the San Ysidro port of

20  entry, attempting to enter the United States. At primary inspection, U.S. Customs and Border Protection

21  (hereinafter "CBP") Officer Duran found a person in the trunk of the vehicle Mr. Quinonez was driving. At

22  approximately 12:50 a.m., Officer Duran placed Mr. Quinonez in handcuffs and escorted him to the security

23  office. At the office, Mr. Quinonez was patted down for weapons and then turned over to the security office

24  staff.

25  //

26  //

27  _____

28          [1] The facts are taken from the discovery provided by the government. Mr. Quinonez does not
stipulate to its accuracy and reserves the right to challenge it at future proceedings.

Six hours later, at approximately 6:45 a.m., Mr. Quinonez was questioned by CBP Officer Sergio Barron. CBP Officer Valdivia witnessed this interrogation.[2] Officer Barron read Mr. Quinonez his <u>Miranda</u> rights and told him about his rights to remain silent, to have an attorney present and have an attorney appointed to represent him if he could not afford an attorney. After Officer Barron read Mr. Quinonez his rights, he asked Mr. Quinonez to read a preprinted form containing his rights and then asked Mr. Quinonez to read out loud a statement indicating that his rights had been read to him. After Mr. Quinonez read the form out loud, Officer Barron asked Mr. Quinonez to sign the form saying that he understood his rights. Once Mr. Quinonez acknowledged he understood his rights, Officer Barron asked if Mr. Quinonez was willing to waive his rights and speak with the agents. Mr. Quinonez did not respond with a yes or no answer, but asked whether he would be detained longer if he did. In response, Officer Barron informed Mr. Quinonez that he was accused of violating 8 U.S.C. § 1324 and was being investigated for alien smuggling. Officer Valdivia then explained that the agents were conducting an investigation and they wanted to give Mr. Quinonez a chance to make a statement and answer questions about his arrest. Officer Valdivia further explained that if Mr. Quinonez wanted to give a statement, he would have to waive his <u>Miranda</u> rights.

In no uncertain terms, Mr. Quinonez shook his head and told the officers "no, I won't waive my <u>Miranda</u> rights." Mr. Quinonez continued "I'd like to have a public defender," and continued to shake his head no. After a moment of silence, Officer Barron - despite this unambiguous and unequivocal invocation of Mr. Quinonez's <u>Miranda</u> rights - reinitiated the interrogation and asked Mr .Quinonez "so you don't want to answer our questions until you get a lawyer?" Mr. Quinonez responded "yeah" and then asked "do I need a lawyer?" Officer Barron replied "no" and then explained Mr. Quinonez had two options: talk to the agents now without a lawyer or to wait to talk with the agents with a lawyer present. Officer Barron concluded by telling Mr. Quinonez that he would not get a lawyer at that moment. Upon hearing that response Mr. Quinonez relented and decided to give a statement and answer the officers' questions.

On February 6, 2008, a two count indictment was handed up charging Mr. Quinonez in count one with bringing in illegal aliens for financial gain, a violation of 8 U.S.C. § 1324(a)(2)(B)(ii), and aiding and

//

---

[2.] This interrogation was recorded on video and a portion of the interrogation captured on DVD is lodged as Exhibit A.

08CR0301-W

abetting, in violation of 18 U.S.C. § 2, and in count two, bringing in illegal aliens without presentation, a violation of 8 U.S.C. § 1324(a)(2)(B)(iii).

## II.

## <u>MOTION TO COMPEL DISCOVERY AND PRESERVE EVIDENCE</u>

Mr. Quinonez moves for production of the following discovery. This request is not limited to those items that the prosecutor knows of, but rather includes all discovery listed below that is in the custody, control, care, or knowledge of any "closely related investigative [or other] agencies." <u>See</u> <u>United States v. Bryan</u>, 868 F.2d 1032 (9th Cir. 1989). Specifically, Mr. Quinonez moves for the production of the following evidence:

1. **Mr. Quinonez's Statements.** Mr. Quinonez requests the government disclose any and all written, recorded and oral statements made by him, as well any written summaries of his oral statements contained in the handwritten notes of any Government agent. Fed. R. Crim. P. 16(a)(1)(A). The Advisory Committee Notes and the 1991 amendments to Rule 16 make clear that the Government must reveal <u>all</u> of Mr. Quinonez's statements, whether written or oral, regardless of whether the Government intends to make any use of those statements. **Mr. Quinonez specifically requests any audio and videotaped copies of his statements and any contemporaneous rough notes taken pertaining to the substance of his statements. Additionally, pursuant to Fed. R. Crim. P. 16(a)(1)(B)(I), Mr. Quinonez requests copies of the audio tapes of any taped telephone call made while he was in custody.**

2. **Arrest Reports, Notes and Dispatch Tapes.** Mr. Quinonez also requests that all arrest reports, notes, dispatch or any other tapes and TECS records that relate to the circumstances surrounding his arrest or any questioning, be turned over. This request includes, but is not limited to, any rough notes, records, reports, transcripts or other documents in which statements of Mr. Quinonez or any other discoverable material is contained. Such material is discoverable under Fed. R. Crim. P. 16(a)(1)(A) and <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). The Government must produce arrest reports, investigator's notes, memos from arresting officers, dispatch tapes, sworn statements, and prosecution reports pertaining to Mr. Quinonez. <u>See</u> Fed. R. Crim. P. 16(a)(1)(B) and (c), Fed. R. Crim. P. 12(I) and 26.2.

3. **Brady Material**. Mr. Quinonez requests all documents, statements, agents' reports, and tangible evidence favorable to Mr. Quinonez on the issue of guilt and/or which affects the credibility of the

Government's witnesses and the Government's case. Under <u>Brady</u>, impeachment as well as exculpatory evidence falls within the definition of evidence favorable to the accused. <u>United States v. Bagley</u>, 473 U.S. 667 (1985); <u>United States v. Agurs</u>, 427 U.S. 97 (1976). Further, <u>Brady</u> requires the government disclose any information that may result in a lower sentence under the sentencing guidelines, notwithstanding its advisory nature, because it is exculpatory and/or mitigating evidence.

4. **<u>Mr. Quinonez's Prior Record.</u>** Mr. Quinonez requests disclosure of his prior criminal record. Fed. R. Crim. P. 16(a)(1)(B). Specifically, he requests a certified copy of the charging documents, plea and sentencing transcripts, and judgment and conviction of any prior conviction used to increase or adjust Mr. Quinonez's sentence under the advisory guidelines.

5. **<u>Any Proposed 404(b) Evidence.</u>** Evidence of prior similar acts is discoverable under Fed. R. Crim. P. 16(a)(1)(c) and Fed. R. Evid. 404(b) and 609. In addition, under Fed. R. Evid. 404(b), "upon request of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the general nature . . . ." of any evidence the government proposes to introduce under Fed. R. Evid. 404(b) at trial. Mr. Quinonez requests the government "articulate <u>precisely</u> the evidential hypothesis by which a fact of consequence may be inferred from the other acts evidence." <u>United States v. Mehrmanesh</u>, 689 F.2d 822, 830 (9th Cir. 1982) (emphasis added; internal citations omitted); <u>see also</u> <u>United States v. Brooke</u>, 4 F.3d 1480, 1483 (9th Cir. 1993) (reaffirming <u>Mehrmanesh</u> and reversing convictions). Mr. Quinonez requests **three weeks notice before trial** to give the defense time to adequately investigate and prepare for trial.

6. **<u>Evidence Seized.</u>** Mr. Quinonez requests production of evidence seized as a result of any search, either warrantless or with a warrant. Fed. R. Crim. P. 16(a)(1)(c).

7. **<u>Request for Preservation of Evidence.</u>** Mr. Quinonez specifically requests the preservation of all physical evidence that may be destroyed, lost, or otherwise put out of the possession, custody, or care of the Government and which relates to the arrest or the events leading to the arrest in this case. This request includes, but is not limited to, the results of any fingerprint analysis, Mr. Quinonez's personal effects, and any evidence seized from Mr. Quinonez.

8. **<u>Tangible Objects.</u>** Mr. Quinonez requests the opportunity to inspect, copy, and test, as necessary, all other documents and tangible objects, including photographs, books, papers, documents, fingerprint analyses, or copies of portions thereof, which are material to the defense, intended for use in the

Government's case-in-chief, or were obtained from or belong to Mr. Quinonez. Fed. R. Crim. P. 16(a)(1)(c). **Specifically, Mr. Quinonez requests color copies of all photographs of any vehicle and  individuals in this case in the Government's possession**, **as well as an opportunity to physically examine and inspect any vehicle in this case at a time mutually convenient to both parties.**

9. **Expert Witnesses.**  Mr. Quinonez requests the name, qualifications, and a written summary of the testimony of any person that the Government intends to call as an expert witness during its case in chief. Fed. R. Crim. P. 16(a)(1)(E). The defense requests the notice of expert testimony be provided a minimum of **three weeks prior to trial** so the defense can properly prepare to address and respond to this testimony, including obtaining its own expert and/or investigating the opinions, credentials of the Government's expert and a hearing in advance of trial to determine the admissibility of qualifications of any expert.  See Kumho Tire Co., Ltd. v.  Carmichael, 526 U.S. 137, 152 (1999) (trial judge is "gatekeeper" and must determine, reliability and relevancy of expert testimony and such determinations may require "special briefing or other proceedings").

10. **Scientific and Other Information.**  Mr. Quinonez requests the results of any scientific or other tests or examinations conducted by any Government agency or their subcontractors in connection with this case.  See Fed. R. Crim. P. 16(a)(1)(D).

11. ***Henthorn* Material.** Mr. Quinonez requests that the Assistant United States Attorney ("AUSA") assigned to this case oversee (not personally conduct) a review of all personnel files of each agent involved in the present case for impeachment material.  See Kyles v. Whitley, 514 U.S. 419 (1995) (holding that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the Government's behalf in the case, including the police"); United States v. Henthorn, 931 F.2d 29 (9th Cir. 1991); United States v. Jennings, 960 F.2d 1488 (9th Cir. 1992) (AUSA may not be ordered to personally conduct examination of records; appropriate Government agency may review files and notify AUSA of contents as long as AUSA makes the determination regarding material to be disclosed); United States v. Herring, 83 F.3d 1120 (9th Cir. 1996) (accord).

12. **Evidence of Bias or Motive to Lie.**  Mr. Quinonez requests any evidence that any prospective Government witness is biased or prejudiced against Mr. Quinonez, or has a motive to falsify or distort his or her testimony.

13. **Impeachment Evidence.** Mr. Quinonez requests any evidence that any prospective Government witness has engaged in any criminal act whether or not resulting in a conviction and whether any witness has made a statement favorable to Mr. Quinonez. See Fed. R. Evid. 608, 609 and 613; Brady v. Maryland, 373 U.S. 83 (1963). **Specifically, Mr. Quinonez requests disclosure of the material witness's A- file and any information relating to their criminal and immigration history.** All of this is relevant impeachment information.

14. **Evidence of Criminal Investigation of Any Government Witness.** Mr. Quinonez requests any evidence that any prospective witness is under investigation by federal, state or local authorities for any criminal conduct.

15. **Evidence Affecting Perception, Recollection, Ability to Communicate, or Truth Telling.** Mr. Quinonez requests any evidence, including any medical or psychiatric report or evaluation, that tends to show that any prospective witness' ability to perceive, remember, communicate, or tell the truth is impaired, and any evidence that a witness has ever used narcotics or other controlled substances, or has ever been an alcoholic.

16. **Witness Addresses.** Mr. Quinonez requests the name and last known address of each prospective Government witness. Mr. Quinonez also requests the name and last known address of every witness to the crime or crimes charged (or any of the overt acts committed in furtherance thereof) who will not be called as a Government witness.

17. **Name of Witnesses Favorable to Mr. Quinonez.** Mr. Quinonez requests the name of any witness who made an arguably favorable statement concerning Mr. Quinonez or who could not identify him or who was unsure of his identity, or participation in the crime charged.

18. **Statements Relevant to the Defense.** Mr. Quinonez requests disclosure of any statement relevant to any possible defense or contention that he might assert in his defense.

19. **Giglio Information & Agreements Between the Government and Witnesses.** Pursuant to Giglio v. United States, 405 U.S. 150 (1972), Mr. Quinonez requests all statements and/or promises, express or implied, made to any witness, in exchange for their testimony in this case, and all other information which could be used for impeachment. Mr. Quinonez also requests discovery regarding any other express or implicit promise, understanding, offer of immunity, of past, present, or future compensation, or any other

kind of agreement, promise, or understanding, including any implicit understanding relating to criminal or civil income tax, forfeiture or fine liability, between any prospective Government witness and the Government (federal, state and/or local). This request also includes any discussion with a potential witness about or advice concerning any contemplated prosecution, or any possible plea bargain, even if no bargain was made, or the advice not followed, and specifically includes any discussion with a potential witness regarding that witness' immigration status and/or any affect that the witness' statements or lack thereof might have on that status, including the granting or revoking of such immigration status or any other immigration status, including but not limited to citizenship, nationality, a green card, border crossing card, parole letter, or permission to remain in the United States.

20. **Informants and Cooperating Witnesses.** Mr. Quinonez requests disclosure of the names and addresses of all informants or cooperating witnesses used or to be used in this case, and in particular, disclosure of any informant who was a percipient witness in this case or otherwise participated in the crime charged against Mr. Quinonez. The Government must disclose the informant's identity and location, as well as the existence of any other percipient witness unknown or unknowable to the defense. Roviaro v. United States, 353 U.S. 53, 61-62 (1957). The Government must disclose any information derived from informants which exculpates or tends to exculpate Mr. Quinonez. Brady v. Maryland, 373 U.S. 83 (1963).

21. **Bias by Informants or Cooperating Witnesses.** Mr. Quinonez requests disclosure of any information indicating bias on the part of any informant or cooperating witness. Giglio v. United States, 405 U.S. 150 (1972). Such information includes, but is not limited to, any inducements, favors, payments or threats that were made to the witness in order to secure cooperation with the authorities.

22. **Jencks Act Material.** Mr. Quinonez requests production in advance of trial of all material, including dispatch tapes, which the Government must produce pursuant to the Jencks Act, 18 U.S.C. § 3500. Advance production will avoid the possibility of delay at trial to allow Mr. Quinonez to investigate the Jencks material. A verbal acknowledgment that "rough" notes constitute an accurate account of the witness' interview is sufficient for the report or notes to qualify as a statement under § 3500(e)(1). Campbell v. United States, 373 U.S. 487, 490-92 (1963); see United States v. Boshell, 952 F.2d 1101 (9th Cir. 1991) (agent's interview notes reviewed with interviewee subject to Jencks Act).

//

### III

### MR. QUINONEZ'S MIRANDA RIGHTS WERE VIOLATED WHEN THE OFFICERS CONTINUED TO QUESTION HIM AFTER HE UNEQUIVOCALLY INVOKED HIS *MIRANDA* RIGHTS AND HIS STATEMENTS MUST BE SUPPRESSED

**A.    Miranda Warnings And A Knowing And Intelligent Waiver Of Those Rights Must Precede Custodial Interrogation**.

It is well known that before a defendant in custody can be questioned about alleged criminal activity, he must be given warnings under Miranda v. Arizona, 384 U.S. 436 (1966), explaining he has the right to remain silent, to have an attorney present during the interrogation and to have an attorney appointed to represent him if he cannot afford to hire one. The Supreme Court in Miranda explained that "when the person being interrogated is 'in custody at the station or otherwise deprived of his freedom of action in any significant way,'" warnings are required. Orozco v. Texas, 394 U.S. 324, 327(1969) (quoting Miranda, 384 U.S. at 477). A suspect is in "custody" for purposes of Miranda if "a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." Thompson v. Keohane, 516 U.S. 99, 112 (1995).

Here, there is no question that Mr. Quinonez was in custody. After the person was found in his trunk, he was placed in handcuffs, patted down for weapons and led to the security station. After waiting at the station for six hours to be interviewed, two armed, uniformed officers placed him in a room and informed him he was being investigated for a violation of 8 U.S.C. § 1324. Nothing highlights that Mr. Quinonez was in custody more dramatically than the fact that the first thing the officers did when they began to speak to Mr. Quinonez was to advise him of his Miranda rights and ensure that he understood them. Clearly, Mr. Quinonez did not feel he was free "to terminate the interrogation and leave." Thompson, 516 U.S. at 112. Therefore, he was in custody and must have been given Miranda warnings before he made a statement.

Once warnings are given, the Supreme Court has explained "the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." Miranda, 384 U.S. at 473-474. For the last forty years, the Supreme Court has zealously safeguarded the accused's right to remain silent. The court has explained when "interrogation continues without the presence of an attorney, and a statement is taken, a *heavy* burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." Miranda, 384 U.S. at 475

(emphasis added) (citation omitted).  It is undisputed that any waiver of the right to remain silent and the right to counsel must be made knowingly, intelligently, and voluntarily in order to be effective. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218 (1973).  The standard of proof for a waiver of these constitutional rights is in the Supreme Court's own words "high." <u>Miranda</u>, 384 U.S. at 475; <u>see also</u> <u>United States v. Heldt</u>, 745 F.2d 1275, 1277 (9th Cir. 1984) (the burden on the government is "great" and the court "must indulge every reasonable presumption against waiver of fundamental constitutional rights").  Accordingly, the burden is on the government to demonstrate that the agents gave Mr. Quinonez <u>Miranda</u> warnings before he made a statement and that he voluntarily, knowingly and intelligently waived those rights before giving a statement. If the government cannot meet its burden, no evidence obtained as a result of the interrogation can be used against him. <u>Miranda</u>, 384 U.S. at 479.

**B.    Mr. Quinonez's <u>Miranda</u> Rights Were Violated When He Was Questioned After He Unequivocally Invoked His <u>Miranda</u> Rights.**

Mr. Quinonez unambiguously and unequivocally invoked his <u>Miranda</u> rights. There is no clearer invocation of the rights under <u>Miranda</u> than Mr. Quinonez's statement  "no, I won't waive my <u>Miranda</u> rights." At the moment Mr. Quinonez indicated he would not waive his <u>Miranda</u> rights, all interrogation must have stopped. Again, as the <u>Miranda</u> court explained, once Mr. Quinonez "indicate[d] in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." <u>Miranda</u>, 384 U.S. at 473-474.

Just three weeks ago, the Ninth Circuit, sitting en banc, found a <u>Miranda</u> violation in an identical situation. In <u>Anderson v. Terhune</u>, 2008 WL 399199 (9th Cir., February 15, 2008) (en banc), a suspect was brought in for questioning regarding a murder. After speaking with officers for three and a half hours, the suspect said "Uh! I'm through with this." After the officers asked him another question, he told the officers "I plead the [F]ifth."  The officer responded with "Plead the [F]ifth. What's that?" and continued to ask him questions. The suspect eventually confessed and was convicted of murder. <u>Anderson</u>, 2008 WL 399199 at *3. The 9th Circuit found that the suspect's <u>Miranda</u> rights had been violated and granted his habeas corpus petition. <u>Id.</u> at *9. The court noted that "we rarely have occasion to address a situation in which the defendant not only uses the facially unambiguous words 'I plead the Fifth,' but surrounds that invocation with a clear desire not to talk any more." <u>Id.</u> at *4. Judge McKeown, writing for the en banc majority,

1  explained "[n]othing was ambiguous about the statement" and noted that Anderson "did not equivocate in

2  his invocation by using words such as 'maybe' or 'might' or 'I think.'" Anderson, 2008 WL 399199 at *5.

3        Here, Mr. Quinonez similarly expressed his desire to invoke his Miranda rights in the clearest

4  language possible: he told the officers "no, I won't waive my Miranda rights." Just like the suspect in

5  Anderson, there was nothing equivocal about this statement. The officers were not "left scratching their

6  heads as to what" Mr. Quinonez meant. See Anderson, 2008 WL 399199 at *5. He did not use words like

7  "'maybe' or 'might' or 'I think.'" Id. The Supreme Court has never required a suspect to invoke his right

8  to silence with anything "more explicit or more technically-worded than 'I have nothing to say.' " Id. at *4

9  (quoting Arnold v. Runnels, 421 F.3d 859, 865 (9th Cir.2005)).  The Miranda decision itself explains that

10  once a person indicates his desire to remain silent "*in any manner*" during questioning, it must cease.

11  Miranda, 384 U.S. at 473-474 (emphasis added). Here, however, there was no ambiguity at all. Mr.

12  Quinonez invoked his rights in the clearest way possible: referencing his Miranda rights by their name.

13        After this clear invocation of his rights, the officers had only one thing to do: stop interrogating Mr.

14  Quinonez immediately. See Miranda, 384 U.S. at 473-474 ( "If the individual indicates in any manner, at

15  any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease."). As

16  the Ninth Circuit stated in Anderson, the "unambiguous, unequivocal invocation should have brought an

17  *immediate* end to questioning." Anderson, 2008 WL 399199 at *5 (emphasis added) (citing Michigan v.

18  Mosley, 423 U.S. 93, 103 (1975) ("The critical safeguard identified in [Miranda] is a person's right to cut

19  off questioning.") (internal quotations and citations omitted)).

20        Instead of ending the interrogation immediately as instructed by the Supreme Court, the officers

21  continued to question Mr. Quinonez, asking him to clarify that he was saying he did not want to talk until

22  he had an attorney. Again, this clarifying question mirrors the situation in Anderson. There, after the suspect

23  told the officers "I plead the [F]ifth," the officer asked "Plead the Fifth. What's that?" Anderson, 2008 WL

24  399199 at *5. The state court reviewing Anderson's conviction on direct review had found that this was a

25  legitimate clarifying question to an ambiguous response by the suspect. The Ninth Circuit, sitting en banc,

26  was unpersuaded. The court wrote "[i]nstead of scrupulously honoring the request, the interrogating officer

27  decided to 'play dumb,' hoping to keep Anderson talking by inquiring, 'Plead the Fifth. What's that?'" Id.

28  As to the state court's conclusion that this was a legitimate clarifying question, the court explained the "need

1   for clarification presumes some ambiguity or uncertainty." But in Anderson's statement, "[n]othing needed

2   clarification." Id. The court noted that "[n]o reasonable officer could legitimately be in doubt about the

3   meaning of 'I plead the Fifth.'" Id. Allowing the police to ask follow up questions to a suspect who

4   unequivocally invokes his right to remain silent to determine whether "he really, *really* wants to invoke the

5   right" was "tantamount to endless re-interrogation." Id. at *7 (emphasis in original). The court concluded

6   that the interrogation was an "egregious violation of Miranda." Id.

7        Again, identical to the situation in Anderson, the officers asked an impermissible question designed

8   to clarify Mr. Quinonez's unequivocal invocation of his Miranda rights. Since Mr. Quinonez's statement

9   "no, I won't waive my Miranda rights" was a clear, unambiguous and unequivocal invocation of his Miranda

10  rights - clearer than "I plead the [F]ifth" - there was nothing to be clarified. Just as no reasonable officer

11  could doubt what "I plead the Fifth" means, the officers here could not doubt what Mr. Quinonez meant

12  when he shook his head and said "no, I won't waive my Miranda rights." Nothing highlights this more than

13  the fact that just immediately before Mr. Quinonez unambiguously invoked his rights, Officer Valdivia told

14  Mr. Quinonez he could talk to the officers only if he waived his Miranda rights. The officers used the word

15  Miranda to describe Mr. Quinonez's constitutional rights and Mr. Quinonez responded by saying he would

16  not give up those rights just mentioned by Officer Valdivia. There was absolutely no ambiguity or

17  equivocation in Mr. Quinonez's response at all. But instead of scrupulously honoring Mr. Quinonez's

18  request to remain silent and have an attorney present, the officers "decided to 'play dumb,'" hoping to keep

19  Mr. Quinonez talking. See Anderson, 2008 WL 399199 at *5; see also Mosley, 423 U.S. at 103 (invocation

20  of Miranda rights must be "scrupulously honored"). This was impermissible.

21       The officers in Anderson could point to some signs of ambiguity in Anderson's behavior. The

22  suspect had talked to the police for three and a half hours, had answered some questions surrounding the

23  investigation, and had continued to talk after he had earlier said "Uh! I'm through with this." Anderson,

24  2008 WL 399199 at *3. The state court relied on these facts to conclude that Anderson had not

25  unequivocally invoked his right to remain silent. Despite these potential ambiguities, the Ninth Circuit found

26  that Anderson's unequivocal invocation of his right to remain silent required the interrogation to end

27  immediately. Here, in contrast, there was absolutely no ambiguity in Mr. Quinonez's responses. Mr.

28  Quinonez invoked his Miranda rights at the very beginning of the interrogation, before officers began to ask

1  him about the details of what happened. Unlike the three and a half hour interrogation in <u>Anderson</u>, Mr.

2  Quinonez invoked his <u>Miranda</u> rights within five minutes of speaking to the officers.

3      In short, there was nothing ambiguous about Mr. Quinonez's invocation. He told the officers in no

4  unclear terms "no, I won't waive my <u>Miranda</u> rights." At that point, the interrogation should have ended

5  immediately. Asking a followup question intended to get Mr. Quinonez, to talk was tantamount to "endless

6  re-interrogation" and violated Mr. Quinonez's Fifth Amendment right against self incrimination. <u>Anderson</u>,

7  2008 WL 399199 at *5. Therefore, his statements must be suppressed.

8  **C.    Mr. Quinonez's Statements Must Be Suppressed Because He Unambiguously Invoked His
        Right To An Attorney And Since He Did Not Reinitiate The Conversation, The Officers Could**

9  **Not Speak To Him Until An Attorney Was Present.**

10     Not only did Mr. Quinonez invoke his rights under <u>Miranda</u>, he specifically invoked his right to have

11  an attorney present. Similar to the unequivocal statement "no, I won't waive my <u>Miranda</u> rights," Mr.

12  Quinonez unambiguously and unequivocally invoked his right to have an attorney when, after invoking his

13  <u>Miranda</u> rights, he told the officers "I'd like to have a public defender." Again, there was nothing ambiguous

14  or equivocal about this statement. There was no "'maybe' or 'might' or 'I think.'" <u>Anderson</u>, 2008 WL

15  399199 at *5.

16     "[T]he assertion of the right to counsel [is] a significant event and that once exercised by the accused,

17  '*the interrogation must cease until an attorney is present*.'" <u>Edwards v. Arizona</u>, 451 U.S. 477, 485 (1981)

18  (quoting <u>Miranda</u>, 384 U.S. at 474) (emphasis added). <u>Edwards</u> held that "an accused . . . having expressed

19  his desire to deal with the police only through counsel, is not subject to further interrogation by the

20  authorities until counsel has been made available to him, unless the accused himself initiates further

21  communication, exchanges, or conversations with the police." <u>Edwards</u>, 451 U.S. at 484-485. As the

22  Supreme Court emphasized, "it is inconsistent with <u>Miranda</u> and its progeny for the authorities, at their

23  instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel." <u>Edwards</u>, 451

24  U.S. at 485. The Supreme Court has subsequently explained that <u>Edwards</u> has created a "second layer of

25  prophylaxis for the <u>Miranda</u> right to counsel." <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 176 (1991). "[W]hen

26  counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel

27  present, whether or not the accused has consulted with his attorney." <u>Minnick v. Mississippi</u>, 498 U.S. 146,

28  153 (1990). So strong are the accused's right to counsel that after invocation of this right, if the police

1  subsequently interrogate the accused, "the suspect's statements are *presumed involuntary* and therefore

2  inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements

3  would be considered voluntary under traditional standards." McNeil, 501 U.S. at 177 (emphasis added).

4     Edwards' "'rigid' prophylactic rule" requires court to determine whether the accused invokes his

5  right to counsel. Davis v. United States, 512 U.S. 452, 458 (1994).[3] Similar to the inquiry into whether the

6  accused has invoked his right to remain silent under Miranda, the accused must make "some statement that

7  can reasonably be construed to be an expression of a desire for the assistance of an attorney." Id. (quoting

8  McNeil, 501 U.S. at 178. The Supreme Court has indicated that a suspect must "unambiguously request

9  counsel" and noted that "a statement either is such an assertion of the right to counsel or it is not." Davis,

10  512 U.S. at 458 (quoting Smith v. Illinois, 469 U.S. 91, 97-98 (1981)).

11     Mr. Quinonez' invocation of his right to have an attorney was just as clear as his invocation of his

12  right to remain silent under Miranda. In no unclear terms, Mr. Quinonez unambiguously and unequivocally

13  invoked his right to an attorney by stating "I'd like to have a public defender." No reasonable officer could

14  construe this statement as anything but an unequivocal request to have an attorney present during his

15  interrogation. Mr. Quinonez's body language only supported this request, as he shook his head no and then

16  stopped speaking. At this point, faced with a clear invocation of the right to counsel and Mr. Quinonez's

17  silence, the officers again had the simple instruction of the Supreme Court: "the interrogation must cease

18  until an attorney is present'" or Mr. Quinonez - not the officers - reinitiated the interrogation. Edwards, 451

19  U.S. at 485.

20

21     [3.] This morning, the 9th Circuit issued an opinion in United States v. Rodriguez, No. 07-10217 (9th
Cir. March 10, 2008) interpreting Davis. Prior to the Supreme Court's decision in Davis, the 9th Circuit
22  had required interrogating officers to clarify an ambiguous or equivocal assertion of Miranda rights before
resuming an interrogation. See Nelson v. McCarthy, 637 F.2d 1291, 1296 (9th Cir. 1981). In Davis, the
23  Supreme Court held that a suspect's ambiguous or equivocal reference to wanting a lawyer present did not
require officers to stop questioning the suspect. Davis, 512 U.S. at 459. This morning's decision in
24  Rodriguez explained that Davis's rule allowing officers to continue questioning in the face of an ambiguous
or equivocal request without asking a clarifying question before reinitiating interrogation only applies to
25  *post-waiver* statements. Thus the clarification rule of Nelson still applies to ambiguous or equivocal
26  statements made *pre-waiver*.
     Here, the clarification rule of Nelson does not apply because, as explained earlier, Mr. Quinonez's
27  pre-waiver statement was not ambiguous or equivocal. Since the officer's could not reasonably say they were
unsure of whether Mr. Quinonez was invoking his Miranda rights, there was no need to ask a clarifying
28  question before reinitiating the interrogation.

1    Yet again, instead of scrupulously honoring Mr. Quinonez's request to have an attorney present, the

2    officers continued to interrogate Mr. Quinonez without the presence of an attorney. Additionally, Mr.

3    Quinonez did not reinitiate interrogation. After saying "I'd like to have a public defender," Mr. Quinonez

4    sat silently in his chair and did not say anything else. It was the officers who then reinitiated the conversation

5    by asking Mr. Quinonez to clarify what he was saying. Only after the officers reinitiated the conversation

6    with Mr. Quinonez - without an attorney present - did Mr. Quinonez speak again. Until the officers talked

7    to Mr. Quinonez again, he had done nothing that indicated he desired to speak or reinitiate the conversation.

8    Since Mr. Quinonez invoked his right to counsel and since the agents subsequently interrogated him, his

9    Miranda right to counsel was violated, his statements "are presumed involuntary" and they must be

10   suppressed. See McNeil, 501 U.S. at 177.

11   **D.  Mr .Quinonez's Subsequent Willingness To Speak To The Officers After He Invoked Both His**
12       **Miranda Rights and His Right To Have An Attorney Present Does Not Indicate A Valid**
         **Waiver Of Those Rights.**

13   It is likely that the government will argue that Mr. Quinonez waived his Miranda rights by eventually

14   speaking to the agents. The Supreme Court, however, has been clear that a "valid waiver 'cannot be

15   established by showing only that [the accused] responded to further police-initiated custodial interrogation.'"

16   Smith, 469 U.S. at 98-99 (quoting Edwards, 451 U.S. at 484); see also Miranda, 384 U.S. at 475 ("valid

17   waiver will not be presumed simply . . . from the fact that a confession was in fact eventually obtained").

18   Furthermore, "[u]sing an accused's subsequent responses to cast doubt on the adequacy of the initial request

19   itself is even more *intolerable*." Id. (Emphasis added). As Justice Brennan has commented, "the police may

20   not create ambiguity in a defendant's desire by continuing to question him or her about it." Connecticut v.

21   Barrett, 479 U.S. 523, 535 n. 5 (1987) (Brennan, J., concurring). "No authority, and no logic, permits the

22   interrogator to proceed ... on his own terms and as if the defendant had requested nothing, in the hope that

23   the defendant might be induced to say something casting retrospective doubt on his initial statement that he

24   wished to speak through an attorney or not at all." Smith, 469 U.S. at 99 (quotations and citations omitted).

25   Here, by asking a clarifying question to the unambiguous and unequivocal invocation of both Mr.

26   Quinonez's Miranda rights and his right to counsel, the officers unreasonably created an ambiguity where

27   none existed. As a result, "the police failed to honor a decision of a person in custody to cut off questioning,

28   either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear

1  down his resistance and make him change his mind." <u>Mosley</u>, 423 U.S. at 105-06. The result is that "such

2  follow-up questions allowed the officer to avoid honoring the Fifth Amendment and . . . enabled 'the

3  authorities through 'badger[ing]' or 'overreaching'- explicit or subtle, deliberate or unintentional - [to] wear

4  down the accused and persuade him to incriminate himself.'" <u>Anderson</u>, 2008 WL 399199 at *7 (quoting

5  <u>Smith</u>, 469 U.S. at 98).

6      Once Mr. Quinonez unambiguously and unequivocally invoked his rights under <u>Miranda</u> as well as

7  his right to counsel, all interrogation had to stop immediately.  By asking a clarifying question when none

8  was needed, the officers violated Mr. Quinonez's <u>Miranda</u> rights and therefore any statements made by Mr.

9  Quinonez must be suppressed.

10  **IV.**

11  **EVEN IF THIS COURT DETERMINES MR. QUINONEZ'S MIRANDA RIGHTS WERE NOT**
    **VIOLATED, A HEARING UNDER 18 U.S.C. § 3501 IS NECESSARY TO DETERMINE**
12  **WHETHER MR. QUINONEZ'S STATEMENTS WERE VOLUNTARY**

13  **A.    A Statement Must Be Voluntary To Comply With The Due Process Clause**

14      Even if a statement is preceded by <u>Miranda</u> warnings, the due process clause prohibits the use of

15  involuntary statements. <u>Arizona v. Fulminante</u>, 499 U.S. 279 (1991); <u>Jackson v. Denno</u>, 378 U.S. 368, 387

16  (1964).  The government bears the burden of proving by a preponderance of the evidence that any confession

17  or statements were voluntarily made by a criminal defendant.  <u>Lego v. Twomey</u>, 404 U.S. 477, 483 (1972).

18  A statement is voluntary if it is the product of a rational intellect and free will.  <u>Blackburn v. Alabama</u>, 361

19  U.S. 199, 208 (1960).

20      As the Supreme Court has explained, in determining whether a statement is voluntary, courts must

21  look at the totality of the circumstances, taking into account factors such as "the youth of the accused; his

22  lack of education; or his low intelligence; the lack of any advice to the accused of his constitutional rights;

23  the length of detention; the repeated and prolonged nature of the questioning; and the use of physical

24  punishment such as the deprivation of food or sleep." <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973)

25  (citations omitted). A statement or confession will be involuntary if coerced by either physical intimidation

26  or psychological pressure. A confession is deemed involuntary not only if coerced by physical intimidation,

27  but also if achieved through psychological pressure.  "The test is whether the confession was 'extracted by

28  any sort of threats or violence, (or) obtained by any direct or implied promises, however slight, (or) by the

1  exertion of any improper influence.'" Hutto v. Ross, 429 U.S. 28, 30 (1976) (per curiam) (quoting Bram

2  v. United States, 168 U.S. 532, 542-43 (1897)). Accord United States v. Tingle, 658 F.2d 1332, 1335 (9th

3  Cir. 1981).

4  **B.    A Hearing Under 18 U.S.C. § 3501 Is Necessary To Determine Whether Mr. Quinonez**
   **Statements Were Voluntary**

5

6          Under 18 U.S.C. § 3501(a), "[b]efore [a] confession is received in evidence, the trial judge shall, out

7  of the presence of the jury, determine any issue as to voluntariness." This Court is thus required to determine

8  whether any statements made by Mr. Quinonez were voluntary. Additionally, 18 U.S.C. § 3501(b) requires

9  this Court to consider numerous enumerated factors in determining whether Mr. Quinonez voluntarily made

10 a statement. These factors include whether he understood the nature of the charges against him and whether

11 he understood his constitutional rights.

12         Section 3501(a) clearly requires this Court to make a factual determination. When a factual

13 determination is required, Federal Rule of Criminal Procedure 12 requires the court to make factual findings.

14 See United States v. Prieto-Villa, 910 F.2d 601, 606-10 (9th Cir. 1990). Since "suppression hearings are

15 often as important as the trial itself," these findings should be supported by evidence, not merely an

16 unsubstantiated recitation of purported evidence in a prosecutor's responsive pleadings. Id. at 610 (quoting

17 Waller v. Georgia, 467 U.S. 39, 46 (1984)). Without the presentation of evidence, this Court cannot

18 adequately consider the 18 U.S.C. § 3501(b) factors.  Therefore, Mr. Quinonez requests this Court conduct

19 an evidentiary hearing pursuant to 18 U.S.C. § 3501(a) to determine, outside the presence of the jury,

20 whether the statements he made were voluntary.

21 **C.    An Evidentiary Hearing Is Also Necessary To Determine Whether The Violation The Safe**
   **Harbor Provision of 18 U.S.C. § 3501(c) Was Reasonable.**

22

23         When a statement is given by an accused within six hours of arrest, 18 U.S.C. § 3501(c) states that

24 the statement "shall not be inadmissible solely because of delay." See United States v. Mendoza, 157 F.3d

25 730, 731 (9th Cir. 1998) ("18 U.S.C. § 3501(c) provides a six-hour "safe harbor" after an arrest and before

26 the arraignment during which a confession will not be excludable solely because of delay."); United States

27 v. Van Poyck, 77 F.3d 285, 288 (9th Cir.1996). "A confession made after the safe harbor period may be

28 excluded solely because of the delay." Mendoza, 157 F.3d at 731. This six hour period may be extended only

1  if the delay is "reasonable" or public policy concerns weigh in favor of admission. Id. (citing Van Poyck,

2  77 F.3d at 288; United States v. Wilson, 838 F.2d 1081, 1084 ( 9th Cir.1988)). The public policy concerns

3  to be considered include "discouraging officers from unnecessarily delaying arraignments, preventing the

4  admission of involuntary confessions, and encouraging early processing of defendants." Mendoza, 157 F.3d

5  at 731-732.

6      Here, there was a six hour delay between Mr. Quinonez's arrest and his subsequent interrogation.

7  According to the government's discovery, Mr. Quinonez approached the port of entry at 12:47 a.m. and was

8  placed in handcuffs and taken into custody after the person was found in his car at 12:50 a.m. He was not

9  interviewed until 6:45 a.m. After he invoked his Miranda rights and his right to remain counsel, he did not

10  actually being speaking to the officers until 6:53 a.m.[4] Since the interrogation is beyond the six hour "safe

11  harbor" permitted under 18 U.S.C. § 3501(c), an evidentiary hearing is necessary to determine whether the

12  delay was reasonable.[5]

13                                              **V.**

14          **THIS COURT SHOULD PRECLUDE THE PROSECUTION FROM PROCEEDING**
                         **UNDER AN AIDING AND ABETTING THEORY**

15

16  **A.      Aiding and Abetting Requires Proof of An Additional Element, Beyond The Elements**
           **of the Underlying Offense, and  Thus, This Element Must Be Alleged In the Indictment.**

17

18      The Fifth Amendment to the Constitution provides in relevant part that "[n]o person shall be held

19  to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury."

20  U.S. Const. Amend. V.  An indictment must allege every essential element of the offense, including implied

21  elements not present in the statutory language.  United States v. Du Bo, 186 F.3d 1177, 1179 (9th Cir. 1999);

22  accord Russell v. United States, 369 U.S. 749, 763-64 (1962).  "If an element is necessary to convict, it is

23  also necessary to indict, because elements of a crime do not change as criminal proceedings progress."

24

25          [4.] The form Mr. Quinonez signed indicating he was willing to waive his Miranda rights and talk with

26  the officers has a time of 6:53 a.m.

27          [5.] It should be noted that all of these times are approximate and that the interrogation may not have

28  started until six hours after Mr. Quinonez had been taken into custody. The fact the interrogation began near
    the end of the "safe harbor" window should lead this Court to grant an evidentiary hearing.

1   United States v. Hill, 279 F.3d 731, 741 (9th Cir. 2002). An indictment's failure to "recite an essential

2   element of the charged offense is not a minor or technical flaw . . . but a fatal flaw requiring dismissal of the

3   indictment." Du Bo, 186 F.3d at 1179.

4       The Ninth Circuit has held that "[o]ur circuit law is clear that aiding and abetting contains an

5   additional element of specific intent, beyond the mental state required by the principal crime." United

6   States v. Sayetsitty, 107 F.3d 1405, 1412 (9th Cir. 1997); see also United States v. Gaskins, 849 F.2d 454,

7   459 (9th Cir. 1988) (expressly stating that "the elements necessary to convict an individual under an aiding

8   and abetting theory are . . . that the accused had the specific intent to facilitate the commission of a crime

9   by another"). Because a defendant is constitutionally entitled to a grand jury finding on every essential

10  element necessary to convict him, this additional intent element must also be alleged in the indictment before

11  the Government may proceed under an aiding and abetting theory.

12  **B.    The Cases Holding that the "Aiding and Abetting" Theory Is Implied in Every Federal
13          Indictment Are Not to the Contrary.**

14      The Ninth Circuit has stated in dictum that aiding and abetting is implied in every indictment. See

15  United States v. Armstrong, 909 F.2d 1238 (9th Cir. 1990); Gaskins, 849 F.2d at 1442; United States v.

16  Michaels, 796 F.2d 1112, 1117-1118 (9th Cir. 1986). None of these cases, however, examined the language

17  used in the indictment but only examined the jury instructions. Accordingly, they do not resolve this

18  question. Because the aiding and abetting statute, 18 U.S.C. § 2, "states a rule of criminal responsibility for

19  acts which one assists another in performing," Nye & Nissen v. United States, 336 U.S. 613, 620 (1949),

20  the acts set forth in section 2 merely describe the means of committing an offense. Armstrong, 909 F.2d at

21  1243; see also United States v. Causey, 835 F.2d 1289, 1292 (9th Cir. 1987); Michaels, 796 F.2d at 1117-

22  1118. Put another way, Armstrong and the cases following it does not hold that an indictment may omit the

23  additional intent element required for a conviction under the aiding and abetting theory; these cases simply

24  recognize that § 2 sets forth the *acts* of the defendant that expose him to liability as a principal. Because

25  //

26  //

27  //

28  //

these cases do not discuss the additional intent element which is necessary to convict a defendant under the aiding and abetting theory, they are inapposite.[6]

**C.    Neither the Prosecution Nor The Court May Broaden the Permissible Bases For Conviction Beyond Those Charged In the Indictment.**

Requiring the proof to remain true to the indictment enables the grand jury to protect citizens from the unilateral power of the Government to institute criminal prosecutions. United States v. Miller, 471 U.S. 130, 139 (1985); accord Ex parte Bain, 121 U.S. 1, 10 (1962), overruled on other grounds by United States v. Cotton, 535 U.S. 625 (2002).[7] Accordingly, the Supreme Court has held that a district court may not broaden the possible bases for conviction beyond those alleged in the indictment. Stirone v. United States, 361 U.S. 212, 218 & n.3 (1960).

"An amendment of the indictment occurs when the charging terms of the indictment are altered, either literally or in effect, by the prosecutor or a court after the grand jury has last passed upon them." United States v. Von Stoll, 726 F.2d 584, 586 (9th Cir. 1984); United States v. Dipentino, 242 F.3d 1090, 1094 (9th Cir. 2001) (finding constructive amendment where district court instructed jury on work practice standard not alleged in indictment). Applying these principles here, if the indictment fails to set forth the additional element of specific intent required to convict a defendant under the aiding and abetting theory, then neither the government nor the district court can broaden the indictment to include aiding and abetting as a possible basis for conviction.

**D.    The Indictment Here Does Not Authorize the Prosecution to Proceed Under an Aiding and Abetting Theory.**

Sayetsitty clearly holds that to convict a defendant under an aiding and abetting theory, the government must prove at least two different intent elements. The defendant must (1) specifically intend to

---

[6.] If § 2 does not require all offense elements to be alleged in the indictment, then it is unconstitutional. Congress cannot exempt its statutes from the requirements of the Grand Jury Clause of the Fifth Amendment. Thus, if this Court holds that § 2 does not require all elements necessary to convict to be alleged in the indictment, then it must strike this statute down.

[7.] Cotton did not overrule Bain, Russell or Stirone. Cotton, 535 U.S. at 630. In fact, it expressly left this holding of Bain intact. Id. Nor did the Bain Court discuss whether an indictment error is a structural defect or whether such an error affects substantial rights. Id. at 630-634. Thus, it does not aid this Court's analysis.

1  aid the principal in the commission of the offense, and (2) have the requisite intent for the underlying

2  offense. Sayetsitty, 107 F.3d at 1412. Aiding and abetting clearly requires proof of an additional intent

3  element beyond the intent required by the statute. Id.

4      Here, for example, to convict under an aiding and abetting theory, the government needs to prove

5  that Mr. Quinonez intended to aid a principal in the commission of the offense, in addition to proving the

6  intent elements attributed to the principal. These are distinct elements, and under Hill and DuBo, all of these

7  elements need to be alleged in the indictment. See Du Bo, 186 F.3d at 1179; Hill, 279 F.3d at 741. Because

8  the indictment here failed to allege this additional intent element, this Court may not allow the government

9  to proceed under an aiding and abetting theory.  A contrary holding constructively amends the indictment

10  and impermissibly broadens the scope of the charges.[8] Thus, this Court should preclude the Government

11  from proceeding under an aiding and abetting theory, or in the alternative dismiss the indictment.

## VI.

## MOTION FOR LEAVE TO FILE FURTHER MOTIONS

14      Mr. Quinonez has received 114 pages and 1 DVD of discovery in this case.  As more information

15  comes to light, due to the Government providing additional discovery in response to these motions or an

16  order of this Court, the defense may find it necessary to file further motions.  It is, therefore, requested that

17  defense counsel be allowed the opportunity to file further motions based upon information gained through

18  the discovery process.

19

20      [8.]  The government may argue that even if the intent to aid and abet were required to be alleged in

21  the indictment, the aiding-and-abetting statute was cited in the indictment here.  It is true that the indictment
here cited - without more -§ 2.  However, this does not render the indictment sufficient.

22      The Ninth Circuit's case law cannot be clearer: when the indictment is questioned prior to trial, "[a]
correct citation to the statute is not sufficient to compensate for the exclusion [of an essential element]."

23  United States v. Kurka, 818 F.2d 1427, 1431 (9th Cir. 1987) (citing Givens v. Housewright, 786 F.2d 1378,

24  1381 (9th Cir. 1986)).  In Kurka, the defendant moved to dismiss the indictment on the ground that it failed
to allege that the damage to the property was willful.  Kurka, 818 F.2d at 1430.  Even though the indictment

25  cited the correct statute, the Ninth Circuit held that "[t]he failure to include the element of willfulness . . .
render[ed] the indictment constitutionally defective," and reversed the defendant's conviction. Id. at 1431.

26  Likewise, here, mere citation to § 2 does not render the indictment sufficient.

27      In any event, § 2 does not set forth any offense elements.  See Armstrong, 909 F.2d at 1241.  Mere
citation to this statute does not reflect that the grand jury considered, much less found, the essential element

28  that Mr .Quinonez had the specific intent to aid the principal in the commission of the offense.  Thus,
citation to § 2 does not cure the deficiency in the indictment.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VII.

## <u>CONCLUSION</u>

For the foregoing reasons, Mr. Quinonez respectfully requests that the Court grant the above motions.

Respectfully submitted,

Dated: March 10, 2008

*s/ Hanni M. Fakhoury*
**HANNI M. FAKHOURY**
Federal Defenders of San Diego, Inc.
Attorneys for Mr. Quinonez
Hanni_Fakhoury@fd.org